**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
NATALIE VARGAS,

                          Plaintiff,            **COMPLAINT**

        -against-

                                      **PLAINTIFF DEMANDS**
                                      **A TRIAL BY JURY**
N.Y.C. HEALTH AND HOSPITALS CORP.,

                          Defendant.

-----------------------------------------------------------X

       Plaintiff NATALIE VARGAS, by and through her attorneys PHILLIPS & ASSOCIATES ATTORNEYS AT LAW, PLLC, hereby complains of the Defendant N.Y.C. HEALTH AND HOSPITALS CORP., upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff brings this action alleging that the Defendant has violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*., as amended, ("ADA"), the New York State Human Rights Law, New York State Executive Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq*. ("NYCHRL"), and seeks damages to redress the injuries she has suffered as a result of being discriminated against on the basis of her disability, not granted a reasonable accommodation, and being unlawfully suspended without pay and terminated from her job.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. §§ 12101 *et seq*., and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state and city

1

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PROCEDURAL PREREQUISITES

5. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 19, 2022.

6. Plaintiff received a Notice of Right to Sue from the EEOC on May 26, 2022 and this action is being commenced within 90 days of its issuance. A copy of the Notice is annexed hereto as **Exhibit A.**

7. A Notice of Claim was filed with N.Y.C. Health and Hospital Corp. on December 17, 2021, less than 90 days after the last day of discrimination. The Claim number is 2022LE000823.

8. Notice requirements of § 8-502 of the New York City Administrative Code have been met by the contemporaneous transmission of this Complaint, to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York. A copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as **Exhibit B**.

## PARTIES

9. Plaintiff, Natalie Vargas, is a female, who resides in Bronx, New York.

10. Plaintiff is a single mother with custody of her two children, ages 6 and 8.

11. After the birth of Plaintiff's second child, in the year 2016, she received a flu vaccine. Afterwards, she experienced a severe allergic reaction, including wide-spread hives on her body, upper respiratory tightness, and difficulty breathing.

12. Plaintiff went to an urgent care facility. She was advised that the reaction occurred as an

       allergy to the flu vaccine.  She was treated and advised to report to the emergency room if she continued to have difficulty breathing.

13. Sometime in or around the year 2017, Plaintiff was diagnosed with Lupus and an auto-immune connective tissue disorder for which she was prescribed a regime of Methotrexate, a strong chemotherapy drug.

14. During the six months of treatment, Plaintiff experienced severe medical side effects that interfered with her work and caused her to take approximately 2 months of intermittent FMLA leave.

15. At present, after engaging in an overhaul of her diet, sleep schedule, and other lifestyle practices, she is in remission.

16. Plaintiff's conditions - drug allergy and auto-immune disorder - rise to the level of a disability substantially limiting the functioning of her immune system and the major life activity of breathing.

17. Defendant N.Y.C. Health and Hospitals Corp. ("Defendant NYCHHC") is a domestic not-for-profit corporation, and a Non-Mayoral agency of the City of New York.

18. Defendant NYCHHC provides health services throughout the City of New York through multiple divisions and health care facilities.

19. One such health care facility is Queens Hospital Center ("Queens Hospital" or "the hospital") located at 82-68 164th Street, Jamaica, New York.

20. At all relevant times, Plaintiff was employed by Defendant NYCHHC at the Queens Hospital Center facility.

21. At all relevant times, Plaintiff could perform the essential functions of her job with or without an accommodation.

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

## MATERIAL FACTS

### Background

22. Plaintiff was employed by Defendant NYCHHC, at several different hospital facilities, for approximately 16 years.

23. Plaintiff began working at Defendant NYCHHC's Queens Hospital facility in August of 2020 as a Systems Analyst, earning approximately $62,000 annually.

24. Plaintiff's job was purely administrative. She did not have any patient contact and worked at a facility separate from the hospital.

25. The primary duties of Plaintiff's job entailed running reports from the hospital's software system called "Epic," and analyzing the data.

26. Since 2016, Plaintiff had been listed in a database of employees medically exempt from the flu vaccine mandate, kept by Defendant NYCHHC's Human Resources' Department ("HR").

27. Plaintiff's job did not require being physically present in the office. Since the pandemic began, most of her colleagues in the office used email as the primary mode of communication.

28. In or around the Spring of 2020, Plaintiff was granted permission to work remotely as needed.

29. Plaintiff set up all requirements to work remotely and had done so on approximately a half-dozen occasions.

30. Plaintiff also complied with all Defendant NYCHCC's mask, temperature checks and weekly testing mandates during the pandemic for those unvaccinated.

### Announcement of Vaccine Mandate

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

31. On or about Friday, September 10, 2021, at 10:00 a.m., all Queens Hospital employees that were not Covid-19-vaccinated were summoned to an emergency meeting in the auditorium.

32. A doctor, nurse, and three of the top executives of Queens Hospital, including the CFO Trish Roberts and CEO Neal Moore, made up the panel conducting the meeting.

33. Neal Moore is the Chief Executive Officer at Queens Hospital, ("CEO Moore"). At all relevant times, CEO Moore was a top-executive, policymaker and/or a manager at Queens Hospital who had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

34. Trisha Roberts is the Chief Financial Officer at Queens Hospital ("CFO Roberts"). At all relevant times, CFO Roberts was an executive, policymaker and/or a manager at Queens Hospital who had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

35. The meeting was called suddenly and carried out in an intimidating manner for the Plaintiff and other employees. The meeting began with the nurse questioning employees individually about why they were not vaccinated and responding in a condescending and dismissive tone to all responses.

36. CEO Moore announced that they were all immediately subject to a Covid-19 vaccine mandate. If they failed to comply, they would be placed on unpaid leave on September 27, 2021, and terminated at some point thereafter.

37. CEO Moore also announced that if anyone wanted to request a medical or religious exemption, they must submit all completed paperwork by Tuesday, September 14, 2021 – just two business days from the announcement.

38. Plaintiff, as a fulltime worker and a single mother, was terrified that she would not be able

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

retrieve the required forms from the Defendant, complete them, and reach her doctor to provide the necessary supporting letter to meet the short deadline.

39. Plaintiff also felt wholly unprepared and anxious throughout the meeting. It had not been scheduled in advance, so she had no chance to formulate or ask important questions she wanted to ask.

40. At stake was her sixteen-year career with Defendant NYCHHC and her job's financial lifeline for her and her young children.

41. Upon information and belief, all the employees present felt extreme pressure and anxiety during the meeting.

42. One employee burst into tears and ran outside of the auditorium in an apparent panic attack. Upon information and belief, she was later taken to the emergency room.

Requesting a Disability Accommodation

43. After leaving the meeting in a shaken state, Plaintiff approached her supervisor, Associate Director Joseph Franolich ("Franolich"), about what felt like an impossibly short timeline for submitting her accommodation request.

44. Franolich had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

45. Fearful and stressed, Plaintiff immediately began the necessary procedure for an accommodation by contacting Human Resources ("HR") and leaving a message for her doctor.

46. As the custodial parent of her two young children, Plaintiff was highly concerned about what might happen to her if she took the vaccine. Because of her medical history, she felt taking the vaccine was like playing Russian Roulette.

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

47. Plaintiff was equally panicked about losing her income.

48. Plaintiff made sure to meet the accommodation request deadline, submitting the required documentation through Defendant NYCHHC's portal along with her Doctor's note, dated September 14, 2021.

49. Plaintiff's doctor's note read in relevant part:

> **Following recommendations of the Advisory Committee on Immunization Practices of the U.S. Department of Health and Human Services and CDC and based on her pre-existing allergic reaction it is imperative that (Plaintiff) is medically exempt from vaccination.**

50. Plaintiff's doctor went on to state that she was available by phone if there were any questions regarding the matter.

51. On September 20, 2021, Plaintiff received an email from Defendant NYCHHC acknowledging her timely submission of the accommodation request form along with "a supporting healthcare provider form requesting exemption from the COVID-19 vaccine due to your underlying medical condition."

52. In the same email, Defendant NYCHHC summarily denied Plaintiff's accommodation request, stating:

> **After an evaluation of your request for an exemption, this Office has determined that the information provided does not establish that immunization with the COVID-19 vaccine is detrimental to your health. Accordingly, your request for a medical exemption from the COVID-19 vaccine is denied.**

53. Upon information and belief, Plaintiff's doctor's note was based both upon her medical judgment and the CDC's guidance which states that a history of a severe allergic reaction to a component of the COVID-19 vaccine or allergy to a component of the vaccine is a contraindication to the COVID-19 vaccine.

54. Upon information and belief, Defendant NYCHHC never contacted Plaintiff's doctor to

7

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

discuss the matter further before usurping her medical opinion.

55. Before rejecting Plaintiff's disability-related accommodation request, Defendant NYCHHC did not request any further information from Plaintiff and made no attempt to even speak with her to seek clarification about her medical situation.

56. Defendant NYCHHC also failed to speak with Plaintiff about alternative accommodations that would have allowed Plaintiff to keep her job and not unduly burden the hospital.

57. On September 20, 2021, Plaintiff attempted to appeal the denial through the same portal that she used to make the request. Plaintiff reiterated the reason for the accommodation request, and wrote, "If you check the Human Resources records you will see that I was unable to receive the flu vaccine in over 5 years." She also cited her doctor's note and provided the link to the CDC recommendations which sets out the contraindication to the Covid-19 vaccine related to allergies.

58. She did not receive a response to the appeal.

59. Plaintiff also reached out to her union representative for local 1407, Sherman Pang ("Pang"), to assist her.

Requesting Remote Work as an Accommodation

60. Upon information and belief, approximately 125 NYCHHC employees were working remotely full-time.

61. Plaintiff had been approved to work remotely as needed and was set up with the necessary portal access to do so.

62. No aspect of Plaintiff's job required her to be on-site.

63. As such, after the denial of her medical exemption request, Plaintiff approached Franolich about converting her job to "fully remote" as an alternative accommodation.

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

64. Franolich told Plaintiff that she should "do what she had to do," and that he would not have a problem with signing off on that option. He asked her to contact HR to figure out next steps.

65. Plaintiff followed up with Keisha Peters in HR ("Peters"), who told her that Franolich would need to write a letter to the Senior Vice President of HR to make the request.

66. Approximately two days after relaying that information to Franolich, he informed Plaintiff that he had been reprimanded for following the approval route Peter's directed. He stated that he was informed the appropriate procedure was to present the accommodation request to CEO Moore and CFO Roberts. In turn, those top executives would ask the Senior Vice President of HR.

67. On September 27, 2021, Plaintiff was placed on unpaid leave and no longer able to be in the office.

68. Increasingly panicked, Plaintiff followed up with Franolich again to inquire about the status of her fulltime remote request. Franolich told her that he had spoken with CFO Roberts earlier in the week and she told him that Plaintiff's *medically* based exemption request had been approved.

69. Not having anything in writing, Plaintiff called Peters in HR to get more information about the supposed approval. Peters told Plaintiff that she only saw her denial in her records.

70. Plaintiff was extremely concerned and frustrated by the ongoing run-around and confusing information she and Pang, the union representative, were receiving.

71. Pang next suggested she try reaching out to the Defendant NYCHHC's Labor Relations department.

72. Plaintiff sent an email to Labor Relations on October 1, 2021, stating in relevant part: "I

9

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

tried to apply for the medical exemption and got denied. However, my job can be 100 percent telecommute and I wanted to see if we can ask the CFO Trisha for that request…my boss Joseph Franolich has approved it…"

73. Labor Relations instructed Plaintiff to contact Human Resources.

74. On October 25, 2021, Plaintiff received a call at home from Maxine Simpson ("Simpson") who works in HR. Simpson called to impress upon Plaintiff that, as her accommodation request to be medically exempted from the mandate had been denied, she needed to get vaccinated by October 29, 2021, or she would be terminated.

75. Plaintiff informed Simpson about the attempts she and Pang were following up on, including the remote work accommodation request, and that her supervisor Franolich had informed her that her medical exemption request had actually been approved.

76. Simpson informed her that she was unaware of any of that and because Plaintiff was unvaccinated, she had only two options: to voluntarily resign or wait to be terminated on November 1, 2021.

77. Plaintiff remained tense and fearful especially considering the muddled and contradictory handling of her accommodation request and the fact that the deadline for her termination was fast approaching. She reached out to Pang again.

78. In an email to CEO Moore, sent October 26, 2021, at 4:36 p.m., Pang introduced himself and set-forth Plaintiff's request to "work 100% remotely due to her medical condition." Pang went on to state:

> **Ms. Vargas said that Trisha Roberts (CFO) approve (sic) for her to work remotely and that you would be contacting HHC central office to make Ms. Vargas a 100% remote worker. Can you give me a status on Ms. Roberts request for Mr. Vargas, your assistance is greatly appreciated.**

79. CEO Moore forwarded Pang's email to CFO Roberts approximately 10 minutes later,

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

stating, **"For your handling. Thanks."**

80. The following morning, October 27, 2021, CFO Roberts emailed Pang, copying CEO Moore, indicating that the request was still in process.

81. CFO Roberts specifically stated the following:

> **Please be advised that I have not directly spoken to Ms. Vargas and therefore have not provided an official approval for her request to work remotely. At present, her direct supervisor [Franolich] is in the process of developing a written proposal outlining her roles and responsibilities to present to myself the CFO and CEO for review and consideration. Once this step is completed, it will be reviewed and sent to the attention of HR for their vetting**.

82. That same day, Plaintiff received an email blast from Defendant NYCCHC reiterating and confirming the deadlines for vaccination and termination. Plaintiff forwarded the email to Franolich and told him it was imperative that she receive an update regarding her request to work fully remote.

83. Franolich responded that he had sent out the proposal for her request two weeks ago but had not received a response. He promised to send the same proposal in a letter format to both CEO Moore and CFO Roberts.

84. Hearing nothing by October 28, 2021, Plaintiff called Franolich to inquire further. He stated that he was speaking to CFO Roberts that day and should have an answer for her by October 29, 2021.

85. October 29, 2021, was the last day Plaintiff could accept an incentive Defendant NYCCHC offered its unvaccinated employees: to voluntarily resign, sign a full release and waiver, and receive a week's pay and a brief extension of Cobra coverage. With her situation seemingly in flux, Plaintiff did not fully consider or accept that offer.

86. Still panicked as she had not heard back from Franolich as promised, Plaintiff called and left him a voicemail and then sent him an email. In response, she received an automated

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

out of office email stating that Franolich would not be back at work until November 2, 2021.

87. Realizing she had been left high and dry by Franolich, NYCHHC, CEO Moore, and CFO Roberts, she was devastated.

88. Plaintiff never did receive a response from Franolich or anyone else at NYCHHC, CEO Moore, or CFO Roberts, regarding the final determination of her disability related accommodation request.

89. Plaintiff was terminated on November 1, 2021.

90. Plaintiff has been filled with anguish and anxiety ever since.

<u>Defendants' Unlawful Conduct and Harm to Plaintiff</u>

91. Defendant was long aware that Plaintiff had a disability related to allergies and had been accommodating Plaintiff's disability as it relates to the flu vaccine mandate for years.

92. Defendant NYCHHC and its top executive, CEO Moore and CFO Roberts, were fully aware of and involved in Plaintiff's accommodation request specifically related to the Covid-19 vaccine mandate.

93. Defendant failed to follow a straightforward and predictable protocol as required by law, and even failed to follow Defendant NYCHHC's written policy in consideration of Plaintiff's requests, resulting in her rights under the ADA, the NYSHRL, and the NYCHRL being violated.

94. Defendant's accommodation request process related to the Covid-19 vaccination mandate was opaque and overly burdensome, resulting in Plaintiff's rights under the ADA, the NYSHRL, and the NYCHRL being violated.

95. Defendant failed to carry-out its duty to engage in an interactive process with Plaintiff

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

related to her disability-related accommodation requests.

96. Defendant unlawfully denied Plaintiff an exemption from the vaccine as a disability-related accommodation.

97. Defendant unlawfully denied Plaintiff her disability-related accommodation request to work remotely in lieu of being vaccinated.

98. Defendant unlawfully suspended Plaintiff without pay and then terminated her due to her disability.

99. Defendant failed to provide either of her reasonable accommodation requests. Neither accommodation would have resulted in an undue burden for Defendant.

100. Defendant's actions and conduct were intentional and aimed at harming Plaintiff.

101. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation, which such employment entails.

102. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

103. Plaintiff has experienced severe emotional distress from being subjected to a dysfunctional and intimidating accommodation request process, being suspended without pay, and ultimately terminated from her long career with Defendant NYCHHC.

104. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

105. Defendant NYCHHC is an employer subject to the ADA, NYSHRL, and NYCHRL.

106. At all relevant times, Plaintiff was an individual with a disability within the meaning of the ADA, NYSHRL, and NYCHRL.

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

107. At all relevant times, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job with or without a reasonable accommodation as defined by § 12111(8) of the ADA.

108. At all times relevant, Plaintiff had a disability which substantially limits the major life activity of breathing and the bodily system related to immunity.

109. Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

110. As such, Plaintiff demands punitive damages against Defendant.

## AS A FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER THE ADA

111. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

112. Plaintiff claims Defendant violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at Section 12101.

113. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112 "Discrimination" states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

114. Defendant failed to engage in an interactive process with Plaintiff related to her accommodation requests.

115. Defendant denied Plaintiff's reasonable accommodation requests even though neither request was unduly burdensome for Defendant.

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

116. Defendant engaged in an unlawful discriminatory practice by discriminating against Plaintiff and terminating her because of her disability.

## AS A SECOND CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

117. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

118. The New York State Executive Law § 296(1)(a) provides that,

> It shall be an unlawful discriminatory practice: For an employer … because of an individual's … disability… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

119. Defendant failed to engage in an interactive process with Plaintiff related to her accommodation requests.

120. Defendant denied Plaintiff's reasonable accommodation requests even though neither request was unduly burdensome for Defendant.

121. Defendant engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by discriminating against Plaintiff and terminating her because of her disability.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYCHRL

122. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

123. The Administrative Code of City of NY § 8-107 [1] provides that,

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived…disability…to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate

15

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

      against such person in compensation or in terms, conditions or privileges of employment.

124. Defendant failed to engage in an interactive process with Plaintiff related to her accommodation requests.

125. Defendant denied Plaintiff's reasonable accommodation requests even though neither request was unduly burdensome for Defendant.

126. Defendant engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by discriminating against Plaintiff and terminating her because of her disability.

## JURY DEMAND

127. Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by the ADA, the NYSHRL, and the NYCHRL, by discriminating against Plaintiff on the basis of her disability.

B. Awarding damages to the Plaintiff, retroactive to the date of her discharge for all lost wages and benefits resulting from Defendant's unlawful termination of her employment and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, interests, and expenses incurred in the

**CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY**

prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
May 26, 2022

                                              **PHILLIPS & ASSOCIATES,**
                                              **ATTORNEYS AT LAW, PLLC**

By: _____
                                              Michelle A. Caiola, Esq.
                                              *Attorney for Plaintiff*
                                              45 Broadway, Suite 430
                                              New York, New York 10006
                                              T: (212) 248-7431
                                              F: (212) 901-2107
                                              mcaiola@tpglaws.com